

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: October 05, 2021.**

_____
CRAIG A. GARGOTTA
UNITED STATES BANKRUPTCY JUDGE
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-50627-CAG |
| | § | |
| BR HEALTHCARE SOLUTIONS, LLC | § | |
| f/d/b/a KARNES CITY HEALTH & | § | |
| REHABILITATION CENTER, | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |

**ORDER DENYING DEBTOR'S EXPEDITED MOTION TO AUTHORIZE USE OF FUNDS AND PAYMENT OF CERTAIN CLAIMS (ECF NO. 68)**

Came on to be considered Debtor's Expedited Motion to Authorize Use of Funds and Payment of Certain Claims (ECF No. 68) ("Motion"), and the United States of America, on behalf of the United States Department of Health and Human Services ("HHS") and the Health Resources and Services Administration ("HRSA") Objection ("Objection") thereto (ECF. No. 74).[1] The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. § 1408(1). This matter is a core proceeding under 11 U.S.C. §§ 157(b)(2)(A) (matters affecting the administration of the estate) and (O) (other proceedings affecting the liquidation of

---

[1] "ECF" refers to the electronic court filing number on the case docket.

assets of the estate) in which the Court may enter a final order.[2] This Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052(a). This matter is referred to this Court under the District Court's Standing Order of Reference. The Court finds Debtor's Motion should be DENIED.

## BACKGROUND

BR Healthcare Solutions, LLC ("Debtor") filed a Voluntary Petition for Relief under Chapter 11 of Title 11, United States Code on March 20, 2020. No trustee or examiner was appointed in this case, nor was a creditor's committee or other official committee appointed pursuant to 11 U.S.C. §1102. On February 25, 2021, the Debtor filed its First Amended Chapter 11 Plan of Liquidation (ECF No. 53) (the "Plan"). On April 29, 2021, an Order Confirming the Plan was entered. (ECF No. 63) (the "Confirmation Order").

An essential component of the Plan concerns the disposition of certain relief funds Debtor received post-petition from the HHS as authorized by the Coronavirus Aid, Relief, and Economic Security Act, also known as the "CARES Act". In April and May 2020, the Debtor received a total of $238,445.41 in relief funds. The Debtor presently has $234,255.32 remaining in its accounts, all of which originated from the HHS relief funds.

The Plan (ECF No. 53) provides the following regarding disposition of the relief funds:

> Section 6.2 Use of HHS Relief Funds. If the Debtor has not already done so, Debtor's counsel shall file a motion within thirty (30) days of the Effective Date seeking direction on the use of the HHS Relief Funds received by the Debtor to determine what amount may be used to fund Allowed Claims in this case. To the extent the Court finds that all or a portion of such funds may not be used to pay certain Allowed Claims in this case, such funds shall be returned to HHS.

---

[2] The United States suggested at oral argument that the funds in question are not property of the estate under 11 U.S.C. § 541 because Debtor had an obligation to return the funds because it was ineligible to receive the funds. The Court does not reach this issue because finds that Debtor was not eligible to receive the funds.

Congress established the Provider Relief Fund (PRF) in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, Title VIII, 134 Stat. 281, 563 (Mar. 27, 2020), and appropriated $100 billion "to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus," (ECF No. 74 Exhibit "Ex." 1 at p. 5). Subsequently, the Paycheck Protection Program ("PPP") and Health Care Enhancement Act, Pub.L. 116-139, Title I, 134 Stat. 620, 623 (Apr. 24, 2020) added an additional $75 billion to the Fund. (ECF No. 74, Ex. 2 at p. 4). HRSA, an operating division of HHS, administers the PRF.

On April 10, 2020, HHS announced the immediate disbursement of the first $30 billion of the Provider Relief Fund. These funds were allocated proportionally to the providers' share of 2019 Medicare fee-for-service payments. An additional $20 billion was distributed to providers based on the most recent tax year annual gross receipts. Debtor's authorized representative and sole member of Debtor, Sanjeev Bhatia, M.D., asserts that he was advised that even if a provider ceased operations, Debtor was still eligible to receive relief funds so long as it provided diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 after January 31, 2020. Further, the medical care that Debtor provided did not have to be specific to treating COVID-19 as HHS broadly viewed every patient as a possible case of COVID-19.[3]

## PARTIES CONTENTIONS

Debtor's principal stated in pleadings filed with the Court that the Texas Medical Association determined that all nursing facility patients were assumed to be potentially COVID-19 positive after January 31, 2020. In response to the COVID-19 pandemic, some health care providers limited in-person visits and cancelled elective procedures to reduce the spread of

---

[3] https://www.aafp.org/family-physician/patient-care/current-hot-topics/recent-outbreaks/covid-19/covid-19-financial-relief/cares-act-provider-relief-fund.html

COVID-19, prepare for COVID-19 patients, and conserve personal protective equipment. Consequently, some providers reported forgone revenue and/or significant financial challenges, making it difficult to sustain services.

Debtor posits that all expenses required to run the facility safely were assumed to be appropriate apart from executive compensation or other items prohibited by the relief act. HHS's website provides the following guidance: "[t]o be considered an allowable expense under the Provider Relief Fund, the expense must be used to prevent, prepare for, and respond to coronavirus. Provider Relief Fund payments may also be used for lost revenues attributable to the coronavirus."[4]

HHS deposited a total of $38,445.41 into the Debtor's operating account in April 2020. On April 29, 2020, Debtor's principal received from HHS the proposed terms and conditions for the relief funds payments and attested to the same. (ECF No. 68, Exhibit "A"). On May 22, 2021, HHS announced a supplemental relief fund distribution to skilled nursing facilities based upon a fixed distribution of $50,000, plus a variable distribution of $2,500 per bed. Debtor received the supplemental distribution on the same date.

The basis of Debtor's Motion seeks Court permission for distribution of the HHS relief funds and to determine if any party in interest, including the United States, had any opposition. At the initial hearing on Debtor's Motion, the parties indicated that a threshold issue for the Court to decide was whether Debtor was eligible to receive the HHS funds after Debtor had ceased operations. The Court reset the hearing to allow the parties to explore settlement. On the reset date of September 2, 2021, the Court heard argument regarding Debtor's eligibility to receive the relief funds.

---

[4] https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/faqs/provider-relief-fund-general-info/index.html#use-of-funds

The United States, HHS's Objection, states that the PRF provides federal assistance to "eligible health care providers," defined in the statutes as "public entities, Medicare or Medicaid *enrolled* suppliers and providers, …." (ECF No. 74, Ex. 1 at p.5).(emphasis added). Moreover, such for profit providers receiving the funds must also attest to the compliance with the Terms and Conditions which state, in pertinent part: "The Recipient certifies that it provides or provided after January 31, 2020 diagnoses, testing, or care for individuals with possible or actual cases of COVID-19; *is not currently terminated from participation in Medicare…*" (ECF No. 74, Ex. 4 at p. 1)(emphasis added).

The Secretary argues that "certifies" is a present tense verb, so at the time of the attestation, the provider could not be "currently terminated." The eligibility information section on the HHS website also requires that the applicant did not permanently cease providing patient care directly or indirectly "entities and not-for-profit entities not otherwise described in this proviso as the Secretary may specify, within the United States (including territories), that provide diagnoses, testing, or care for individuals with possible or actual cases of COVID 19…" (ECF No. 74, Ex.1 at 5; Ex. 2 at 5).

The United States maintains that Debtor was not an "eligible health care provider" because it was not enrolled in Medicare or Medicaid, or otherwise eligible. (ECF No. 74, Ex. 1, 2). The United States argues that the Secretary's interpretation of the statute is evident in the Terms and Conditions which require the entity to certify it "is not currently terminated from Medicare participation." (ECF No. 74, Ex. 3 at 1; Ex. 4 at 1). Further, the United States argues that under the applicable Medicare enrollment regulations, "A cessation of business is deemed to be a termination by the provider, effective with the date on which it stopped providing services to the community." 42 C.F.R. § 489.52(b)(3). Sanjeev Bhatia, M.D. , Debtor's principal, states in his Affidavit "[i]n January 2020, I decided to close the nursing home due a sustained period of net

operating losses. By February 4, 2020, all of the remaining patients were transitioned out of the nursing home to other providers. The Debtor has not provided patient care to any patients since that time and does not intend to resume providing patient care." Affidavit of Sanjeev Bhatia, M.D., dated March 26, 2020 (ECF No. 5, Ex. A).

On April 6, 2020, the Center for Medicare and Medicaid Services ("CMS") sent Debtor a letter stating, "The Centers for Medicare & Medicaid Services (CMS) has been notified that your Skilled Nursing Facility (SNF) voluntarily withdrew from the Medicare program on February 3, 2020. As a result, the provider number shown above has been canceled effective February 3, 2020. Once this number is terminated it will not be reactivated." (ECF No. 74, Ex.5 at p.1). CMS also attached the "Tie Out" form (CMS-1539) confirming the Debtor's voluntary termination from Medicare and Medicaid. (ECF No. 74, Ex. 5 at p. 2).

On April 30, 2020, Dr. Sanjeev Bhatia, M.D., filed two attestations certifying compliance with the Terms and Conditions. On May 22, 2020, Debtor received an additional $200,000 from the Skilled Nursing Home appropriation. (ECF No. 68, Ex. A; ECF No. 74, Ex. 4). Debtor did not return the funds within 90 days, thereby certifying its compliance with the Terms and Conditions. (ECF No. 74, Ex. 4 at p. 1).

Debtor's counsel stated at the hearing that Debtor filed chapter 11 due to sustained losses and a reduction of cash flow. As a result, Debtor resorted to cash advance loans that exacerbated Debtor's financial problems. When Debtor failed to pay the cash advance lenders, the lenders garnished Debtor's bank accounts. Debtor elected to then file chapter 11 and transitioned all its patients to other facilities. Debtor's counsel explained that the premise to filing the chapter 11 case was to collect Debtor's outstanding accounts receivables, believed to be more than $800,000.00. After the chapter 11 case was filed on March 20, 2020, Debtor received PRF money in its debtor-in-possession bank account of $238,445.41 in three installments during April and May 2020.

6

Debtor's counsel argued that Debtor was not advised at the time of the receipt of the funds that Debtor was a terminated provider or ineligible to receive the money.

Debtor's counsel also argued that Debtor received no guidance regarding Debtor's eligibility to receive the PRF money because HHS did not publish any implementing regulations under the Code of Federal Regulations. Moreover, Debtor contends that a facial reading of the HHS terms and conditions suggests that to be eligible to receive PRF relief funds, Debtor only had to verify that Debtor was not currently terminated by CMS. Debtor reasons that because the confirmed Plan allowed Debtor to collect Medicare receivables and remit any funds collected to satisfy any cost report overpayments to CMS, Debtor was not "currently terminated". Debtor also argues that at the time Debtor was treating patients —January 2020—it would have been eligible to receive PRF funds. Moreover, any services that Debtor provided before February 3, 2020, (the date CMS terminated Debtor's provider number), Debtor would have been eligible to bill for any expenses associated with those services. As such, Debtor argues that it would be eligible to receive PRF relief funds based upon past services.

## DISCUSSION

Neither party introduced any evidence nor were there any stipulation as to facts. The Court queried Debtor and United States counsel as to any factual disputes and the parties indicated there were none. As such, there was no dispute as to the operative facts – the date Debtor ceased operations; the date Debtor transferred patients to other skilled nursing facilities; the date that CMS terminated Debtor's provider number; and the date that Debtor received the PRF relief funds. The parties also advised the Court that there was not any published case law concerning Debtor's eligibility to receive the PRF relief funds. The parties also stated that the Court would need to employ a statutory construction as to HHS's terms and conditions.

The documentary evidence that the Court is summarized as follows. In support of Debtor's

Motion to Waive Appointment of Patient Care Ombudsman (ECF No. 5), Sanjeev Bhatia, M.D., declared in part:

> In January, 2020, I decided to close the nursing home [Debtor] due a sustained period of net operating losses. By February 4, 2020, all of the remaining patients were transitioned out of the nursing home to other providers. The Debtor has not provided patient care to any patients since that time and does not intend to resume providing patient care.

ECF No. 5, Ex. A at ¶ 3.[5]

CMS notified Debtor that Debtor voluntarily withdrew from the Medicare program on February 3, 2020, and that Debtor had been terminated the same day. (ECF No. 74, Ex.5). As such, there is no dispute that Debtor was no longer operating and had been terminated as a skilled nursing provider before Debtor received any PRF relief funds. Therefore, the Court must determine if Debtor was eligible to receive the funds and if the Court should adopt the United States' interpretation of "ineligibility".

42 C.F.R. § 489.52(b)(3) (2017) provides that "A cessation of business is deemed to be a termination by the provider [for a skilled nursing facility], effective with the date on which it stopped providing services to the community." One court has observed that the HHS Secretary has the administrative discretion to determine whether and how a provider agreement is terminated. *Parkview Adventist Medical Center v. United States*, No. 2:15-CV-00320-DL, 2016 WL 3029947, at *7 (D. Maine May 25, 2016). The court found that the HHS Secretary had the authority and discretion to determine the effective date of termination because this type of determination requires application of the Medicare program laws and regulations. *Id*. (Citations omitted).

In addition, the Supreme Court has provided two canons of construction that apply here. In

---

[5] Debtor's Small Business Monthly Operating Report for March 20-31, 2020, indicates that Debtor stopped operating prior to the filing of the Report. (ECF No. 17).

***Chevron, USA, Inc., LLC v. Natural Resources Defense Council***, the Court found:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. 837, 842-44 (1984) (Internal footnotes omitted).

The Court also noted that:

We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.

*Id*. at 844. (Internal footnote omitted).

The Court finds that the Secretary's interpretation of the HHS Terms and Conditions is correct. The Court agrees that the PRF provides federal assistance to "eligible health care providers," defined in the statutes as "public entities, Medicare or Medicaid enrolled suppliers and providers." Moreover, such for profit providers receiving the funds must also attest to the compliance with the Terms and Conditions which state, in pertinent part: "The Recipient certifies that it provides or provided after January 31, 2020 diagnoses, testing, or care for individuals with possible or actual cases of COVID-19; *is not currently terminated from participation in Medicare…*" (ECF No. 74, Ex. 3 at 1; Ex. 4 at 1)(emphasis added).

The Court agrees with the HHS Secretary that "certifies" is a present tense verb, so at the time of the attestation, the provider could not be "currently terminated." The eligibility information section on the HHS website also requires that the applicant did not permanently cease providing patient care directly or indirectly "entities and not-for-profit entities not otherwise described in this

9

proviso as the Secretary may specify, within the United States (including territories), that provide diagnoses, testing, or care for individuals with possible or actual cases of COVID 19…" (ECF No. 74, Ex.1 at p. 5; Ex. 2 at p. 5)

In addition, the Court finds that it should apply the plain meaning of the Terms and Conditions. *See* **United States v. Enterprises, Inc.**, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'") (alteration in original) (quoting **Griffin v. Oceanic Contractors, Inc.**, 458 U.S. 564, 571 (1982)). Here, the Terms and Conditions require the recipient to certify the provider is not currently terminated from participation in Medicare. Debtor's sole member acknowledged that Debtor ceased operations on February 3, 2020. 42 C.F.R. § 489.52(b)(3) makes clear a cessation of operations is termination. The Terms and Conditions make clear the provider must be enrolled in Medicare to receive the funds. A plain reading of the HHS Terms and Conditions shows that skilled nursing facility such as Debtor must have been enrolled in the Medicare program, which Debtor was by its own admission not. The Court finds that a plain reading of the Terms and Conditions is that Debtor was terminated as a Medicare provider and not eligible to receive PRF funds.

IT IS THEREFORE ORDERED that Debtor's Expedited Motion to Authorize Use of Funds and Payment of Certain Claims (ECF No. 68) is DENIED. IT IS FURTHER ORDERED that Debtor return the PFR funds in its bank account within 15 days of entry of this Order.

# # #